**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER SIMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:11CV 84 CAS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | )` | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Christopher Simpson for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the

Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer.

(Doc. No. 15).

**Procedural History**

On May 13, 2008, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on October 14, 2007. (Tr. 95-99). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated November 3, 2009. (Tr. 43-50, 53-58, 8-

18). On November 17, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on October 14, 2009. (Tr. 21). Plaintiff was present and was represented by counsel. (Id.). Vocational expert James Israel was also present. (Id.).

The ALJ examined plaintiff, who testified that he was forty-four years of age and completed the ninth grade. (Tr. 23). Plaintiff stated that he dropped out of school in the tenth grade to work. (Tr. 24). Plaintiff testified that he lived alone in a camper on his parents' property. (Id.).

Plaintiff stated that he was released from his last position on October 15, 2007. (Id.). Plaintiff testified that he his last position was a temporary position at a Coca Cola plant. (Id.).

Plaintiff stated that he collected unemployment benefits after he was released from this position. (Id.). Plaintiff acknowledged that, in order to receive unemployment benefits, he had to tell the State of Missouri that he was ready, willing, and able to work. (Tr. 25). Plaintiff explained that he had no income and had to do something. (Id.). Plaintiff stated that he went on a few interviews but was never offered a job. (Id.).

Plaintiff testified that he was not working at the time of the hearing because he was unable to find a position and because he was doing a lot of work around his parents' house after the death of his father. (Id.). Plaintiff stated that he also has problems with falling asleep while

driving a car and driving a forklift.  (Id.).  Plaintiff testified that he was released from employment

on one occasion for "being lost too much."  (Id.).  Plaintiff stated that he would frequently forget

the task he was trying to accomplish on the job and would waste a lot of time.  (Id.).

Plaintiff testified that his claim for disability benefits is based primarily on mental health

issues rather than physical problems.  (Id.).  Plaintiff stated that he has a pinched disk in his neck

that occasionally leaks spinal fluid, although this has not occurred in five to six years.  (Id.).

Plaintiff testified that he has sleep apnea[1] and that he uses a CPAP[2] machine.  (Tr. 26).  Plaintiff

stated that he also has high blood pressure, acid reflux, allergies, high cholesterol, and migraines.

(Id.).

Plaintiff testified that he has been diagnosed with bipolar disorder[3] and ADHD.[4]  (Id.).

Plaintiff stated that he was seeing a psychologist for these problems at the time of the hearing.

(Id.).  Plaintiff testified that his psychiatrist, Dr. Omar Quadri, has prescribed Lithium,[5]

---

[1]Absence of breathing during sleep, associated with frequent awakening and often with daytime sleepiness.  Stedman's Medical Dictionary, 119 (28th Ed. 2006).

[2]Continuous positive airway pressure ("CPAP") is a technique of respiratory therapy, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit.  Stedman's at 1558.

[3]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[4]Attention deficit hyperactivity disorder ("ADHD") is a behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness (short attention span, distractability, inability to complete tasks, difficulty in following directions), impulsiveness (acting without due reflection), and hyperactivity (restlessness, fidgeting, squirming).  Stedman's at 568.

[5]Lithium is indicated in the treatment of manic episodes of manic-depressive illness.  See Physicians' Desk Reference (PDR), 1485 (59th Ed. 2005).

Trazodone,[6] and Effexor[7] for his mental impairments.  (Id.).

Plaintiff stated that he smokes cigarettes, although he has cut back significantly.  (Tr. 27). Plaintiff testified that his mother buys him a carton of cigarettes a week, which lasts about two weeks.  (Id.).

Plaintiff stated that he was unmedicated at the time of the hearing.  (Id.).

Plaintiff testified that he has applied for jobs online.  (Id.).  Plaintiff stated that he helps his mother with household chores and takes care of his camper.  (Id.).  Plaintiff testified that he cooks microwave meals and does his own laundry.  (Tr. 28).  Plaintiff stated that he can drive, although he tries to avoid driving.  (Id.).  Plaintiff testified that his sister drove him to the hearing.  (Id.). Plaintiff stated that he occasionally shops for groceries alone, and he occasionally shops with his mother.  (Id.).

Plaintiff testified that, at one point in time, he regularly spent hours at K-Mart and Wal-Mart wandering around because he did not want to go home.  (Id.).  Plaintiff stated that he typically went to the stores at around midnight when it was not crowded.  (Id.).

Plaintiff testified that he was able to walk for about half an hour before he has to sit down. (Tr. 29).  Plaintiff stated that he was able to stand for about one hour.  (Id.).  Plaintiff testified that he was able to sit for forty to forty-five minutes.  (Id.).  Plaintiff stated that he was able to lift about sixty-five pounds.  (Id.).  Plaintiff testified that he has reduced grip strength.  (Id.).  Plaintiff stated that he has not undergone any recent imaging on his neck.  (Tr. 30).          Plaintiff

---

[6]Trazodone is an antidepressant indicated for the treatment of depression.  See PDR at 3296.

[7]Effexor is an antidepressant indicated for the treatment of major depressive disorder.  See PDR at 3321.

testified that the psychiatric medications were not helping as much as they once did. (Id.). Plaintiff stated that he has talked to Dr. Quadri recently about changing medications. (Id.). Plaintiff testified that Dr. Quadri told him he could either start over with his medications or undergo shock, and that both options required hospitalization. (Id.).

Plaintiff stated that he cannot leave his mother. (Id.). Plaintiff explained that his mother has been depressed since the death of his father and that she has attempted suicide. (Id.). Plaintiff testified that he has been taking care of his mother since his father's death. (Id.).

Plaintiff stated that he enjoys target shooting with pellets and BBs. (Id.). Plaintiff testified that this activity helps him to relax. (Tr. 31). Plaintiff stated that he uses the computer to look for jobs and play games. (Id.).

Plaintiff testified that he had recently planned on marrying the mother of his son's girlfriend but the relationship ended. (Id.).

Plaintiff stated that his father was diagnosed with cancer on January 5, 2008. (Tr. 32). Plaintiff testified that his psychiatrist recommended that he go to the hospital at this time because he became very depressed and tried to jump off a bridge. (Id.). Plaintiff stated that he was hospitalized in 2005 for suicidal thoughts. (Id.). Plaintiff testified that he was also hospitalized in 2006 for suicidal thoughts. (Id.). Plaintiff stated that he occasionally had suicidal thoughts at the time of the hearing. (Id.). Plaintiff testified that he also occasionally hears voices and that he last heard voices on Christmas day of 2008. (Tr. 33).

Plaintiff's attorney then examined plaintiff, who testified that the last grade he completed was ninth grade. (Id.). Plaintiff stated that he started taking LD classes in third grade. (Id.). Plaintiff testified that he never earned a GED. (Id.). Plaintiff stated that he took GED classes but

became discouraged by the teacher.  (Id.).

Plaintiff testified that he has been hospitalized several times for his psychiatric problems. (Id.).  Plaintiff stated that he hears things that are not there, including music, almost every day. (Tr. 34).  Plaintiff testified that when this occurs, he waits until the sounds go away.  (Id.).

Plaintiff stated that he also sees things that are not there.  (Id.).  Plaintiff testified that this occurs about three to four times a week.  (Id.).  Plaintiff stated that the objects eventually go away.  (Id.).

Plaintiff testified that he experiences anxiety attacks.  (Id.).  Plaintiff stated that he becomes nervous and shakes and is unable to sit still.  (Id.).  Plaintiff testified that this occurs two to three times a week.  (Tr. 35).  Plaintiff stated that when he experiences an anxiety attack, walking in the woods helps to calm him.  (Id.).

Plaintiff testified that he does not sleep well at night.  (Id.).  Plaintiff stated that he wakes every one to two hours.  (Id.).

Plaintiff testified that he experiences crying spells several times a day.  (Id.).  Plaintiff stated that he did not know how long these spells lasted.  (Tr. 36).

Plaintiff testified that he occasionally just blanks out and stares.  (Id.).  Plaintiff stated that this occurs two to three times a week.  (Id.).

The ALJ then re-examined plaintiff, who testified that he had not talked to Dr. Quadri about experiencing audio or visual hallucinations in a while.  (Id.).  Plaintiff stated that Dr. Quadri had been trying to hospitalize plaintiff since his father's death and that he did not want to be hospitalized.  (Id.).

The ALJ then examined the vocational expert, James Israel, who testified that plaintiff's

past work as a laborer and a yardman was unskilled and medium. (Tr. 37). Mr. Israel testified that plaintiff has past work as a stocker in retail, which is unskilled and medium. (Id.). Mr. Israel stated that plaintiff's forklift operator job is semi-skilled and medium. (Id.). Mr. Israel stated that plaintiff's trash collecting work was light. (Id.). Mr. Israel testified that plaintiff had no transferable skills. (Id.).

The ALJ asked Mr. Israel to assume a hypothetical claimant with plaintiff's background who was limited to medium work and who should avoid concentrated exposure to pulmonary irritants, unprotected heights, and hazardous machinery. (Id.). Mr. Israel testified that the individual could perform some of plaintiff's past trash collecting jobs, stocking jobs, and cleaning jobs. (Id.).

The ALJ then asked Mr. Israel to assume the additional limitations of unskilled work which requires no more than occasional contact with the public and co-workers. (Tr. 39). Mr. Israel testified that the individual could perform plaintiff's past work as a trash collector. (Id.).

The ALJ next asked Mr. Israel to limit the individual to light work with the additional limitations of never climbing ropes, ladders, and scaffolds; and avoiding concentrated exposure to pulmonary irritants, unprotected heights, and hazardous machinery. (Id.). Mr. Israel testified that the individual would be capable of performing the trash collecting job because plaintiff performed it at the light level. (Id.).

The ALJ then asked Mr. Israel to assume the additional limitations that the job must allow for occasional unscheduled disruptions of both the workday and workweek secondary to periods of decompensation, potential effects of medication, necessity to be gone frequently for treatment, and inability to focus and concentrate on the job for a full eight hours in a day. (Tr. 40). Mr.

Israel testified that such an individual would be unable to perform any of plaintiff's past work or any other jobs in the national or regional economy. (Id.). Mr. Israel stated that employers would not tolerate an employee with reliability, attendance, and persistence problems. (Id.).

**B.    Relevant Medical Records**

The record reveals that plaintiff regularly saw psychiatrist Omar Quadri, M.D. at Crider Center for Mental Health beginning in January 2005. On January 26, 2005, plaintiff reported that he had been feeling stressed because of financial problems and his inability to get a job. (Tr. 312). Plaintiff indicated that he had a good relationship with his eighteen-year-old girlfriend. (Id.). Plaintiff was polite, calm, and cooperative and had good eye contact. (Id.). Plaintiff's affect was euthymic.[8] (Id.). Plaintiff was fidgeting with his legs. (Id.). Plaintiff's thoughts were logical and goal-directed and he had no suicidal or homicidal thoughts. (Id.). Plaintiff denied feeling hopeless, helpless, or worthless. (Id.). Dr. Quadri diagnosed plaintiff with ADHD; bipolar disorder NOS; and borderline personality disorder.[9] (Id.). Dr. Quadri prescribed Effexor, Trazodone, Lithium, and Straterra.[10] (Id.).

On April 13, 2005, plaintiff reported feeling worse with mood "roller coastering." (Tr. 314). Plaintiff had fears of abandonment since he found a love letter that his girlfriend had written to another man. (Id.). Dr. Quadri diagnosed plaintiff with ADHD; bipolar disorder NOS; and

---

[8]Moderation of mood; not manic or depressed. Stedman's at 678.

[9]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilation, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone. Stedman's at 568.

[10]Straterra is indicated for the treatment of ADHD. See PDR at 1885.

borderline personality disorder-primary diagnosis. (Id.). Dr. Quadri advised plaintiff to get individual counseling to address low self-esteem, self doubt, and poor coping skills. (Id.). On April 26, 2005, plaintiff reported that he had felt suicidal after having a confrontation with his girlfriend about her cheating on him. (Tr. 310). Plaintiff reported that he no longer felt suicidal because his relationship had improved. (Id.). On June 29, 2005, plaintiff reported feeling down because he broke up with his girlfriend but he denied any suicidal thoughts. (Tr. 309).

On August 10, 2005, plaintiff reported feeling sad and depressed. (Tr. 307). Dr. Quadri indicated that plaintiff was hospitalized at St. Anthony's several weeks prior because of depression, but was released after three days with no medication changes. (Id.). Plaintiff endorsed hopeless and worthless feelings but denied suicidal thoughts, intent, or plan. (Id.). Plaintiff wanted to try different medications. (Id.). Dr. Quadri diagnosed plaintiff with ADHD and borderline personality disorder. (Id.). He discontinued the Effexor, and started plaintiff on Cymbalta.[11] (Id.).

On September 9, 2005, Dr. Quadri indicated that plaintiff had been hospitalized at St. Joseph's because "everyone was getting mad and yelling" at him and he started to feel suicidal. (Tr. 308). Plaintiff reported that he was thinking about overdosing on Cymbalta. (Id.). Plaintiff indicated that he felt better since being released. (Id.). Dr. Quadri added Risperdal[12] to plaintiff's medication regimen. (Id.).

On October 5, 2005, plaintiff reported feeling much better since starting Risperdal and described his mood as "decent." (Tr. 305). Plaintiff denied any suicidal or homicidal thoughts. (Id.). Dr. Quadri diagnosed plaintiff with ADHD; depressive disorder NOS; and borderline personality

---

[11]Cymbalta is indicated for the treatment of major depressive disorder. See PDR at 3431.

[12]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia. See PDR at 1742.

disorder-primary diagnosis. (Id.). Dr. Quadri decreased plaintiff's dosage of Risperdal due to complaints of daytime sedation. (Id.). On November 2, 2005, plaintiff requested that his dosage of Risperdal be increased. (Tr. 306). Plaintiff reported that he was not having suicidal thoughts since he started Risperdal and that he feels more in control of different situations. (Id.). Dr. Quadri continued plaintiff's medications. (Id.). On December 1, 2005, plaintiff reported that he was doing well with the Risperdal. (Tr. 303). On January 11, 2006, plaintiff reported feeling down for several weeks due to boredom. (Tr. 304). Plaintiff reported that he was talking to a girl in Georgia online. (Id.).

On February 15, 2006, plaintiff presented with his sister, who reported that plaintiff had been feeling suicidal. (Tr. 293). Plaintiff reported having thoughts of killing his son and killing himself. (Id.). Plaintiff appeared depressed with downcast eyes. (Id.). Plaintiff's sister reported past episodes of mania characterized by euphoric mood, overly optimistic future plans, excessive spending when he has no money, racing thoughts, being very "giggly," not sleeping, having excessive energy and increased goal-directed activity. (Id.). Plaintiff's sister reported that plaintiff had several first-degree relatives with bipolar disorder, including herself. (Id.). Dr. Quadri diagnosed plaintiff with ADHD; bipolar disorder I[13] currently depressed; and borderline personality disorder-primary diagnosis. (Id.).

On February 24, 2006, Dr. Quadri indicated that plaintiff had been released from the hospital after two days. (Tr. 294). Dr. Quadri noted that Geodon[14] and Lithium were added and that there was discussion about discontinuing Risperdal. (Id.). Plaintiff reported doing well. (Id.). Plaintiff

---

[13]An affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes. Stedman's at 568.

[14]Geodon is an antipsychotic drug indicated for the treatment of schizophrenia. See PDR at 2610.

had not had any suicidal or homicidal thoughts since he was released from the hospital and denied feeling sad or depressed.  (Id.).  Plaintiff's thought process was logical and goal-directed with realistic concerns.  (Id.).  Plaintiff discussed taking GED classes but indicated that he had a difficult time with reading comprehension and with writing essays.  (Id.).  On March 24, 2006, plaintiff reported being under stress because his nineteen-year-old son was arrested.  (Tr. 295).  Plaintiff's mood was fair given the circumstances.  (Id.).  Plaintiff felt lonely and had been trying to meet someone.  (Id.).  Plaintiff denied mood swings or suicidal or homicidal thoughts.  (Id.).  On May 17, 2006, plaintiff reported that he was doing well and that his mood was good since he had been busy working and had no time to think negative thoughts.  (Tr. 297).  On June 28, 2006, plaintiff reported that his mood had been generally good except when a twenty-three-year-old girl he was trying to date rejected him. (Tr. 298).  Plaintiff reported no recent suicidal thoughts.  (Id.).  On September 13, 2006, plaintiff reported feeling depressed the past month because his son was sentenced to ten years in prison.  (Tr. 300).  Plaintiff denied having had any suicidal thoughts and had been feeling more tired and sleepy. (Id.).  On October 11, 2006, plaintiff reported that his mood was "like a yo yo."  (Tr. 301).  Plaintiff indicated that his mood was fairly stable at work because he does not have time to think but he starts to feel depressed when he returns home.  (Id.).  Plaintiff continued to pursue relationships online. (Id.).  On November 8, 2006, plaintiff reported feeling depressed in the context of several financial stressors.  (Tr. 302).  Plaintiff was lonely and depressed and desperately sought a relationship.  (Id.). Plaintiff denied suicidal or homicidal thoughts.  (Id.).

Plaintiff saw Dr. Quadri on January 10, 2007, with complaints of feeling depressed lately because he had to move out of his trailer into his father's basement.  (Tr. 267).  Plaintiff denied suicidal or homicidal thoughts.  (Id.).  Dr. Quadri found that plaintiff was polite, calm, and

cooperative.  (Id.).  Plaintiff's grooming and hygiene was fair.  (Id.).  Plaintiff's affect was euthymic, his thought process was logical with no pressure, latency or loose associations.  (Id.).  Plaintiff reported no hallucinations or delusions.  (Id.).  Plaintiff was alert and oriented, was sleeping well, and had a good energy level.  (Id.).  Dr. Quadri diagnosed plaintiff with ADHD; bipolar I disorder currently depressed; and borderline personality disorder.  (Id.).  He prescribed Effexor, Trazodone, Straterra, Lithium, and Clonazepam.[15]  (Id.).

Plaintiff saw Dr. Quadri on February 7, 2007, at which time he reported feeling unhappy and stressed because his wages were being garnished for back child support, his father was always pressuring him to get another job, and he was lonely and did not have a girlfriend.  (Tr. 268).  Plaintiff reported that he started to swing and punch in his sleep after his Trazodone was increased, and that he had more daytime somnolence.  (Id.).  Plaintiff denied suicidal or homicidal thoughts.  (Id.).  Plaintiff was polite, calm, and cooperative; his effect was euthymic; his thought process was logical.  (Id.).  Plaintiff had no hallucinations or delusions.  (Id.).  Dr. Quadri reduced plaintiff's dosage of Trazodone due to daytime hypersomnolence.  (Id.).

Plaintiff saw Dr. Quadri on March 14, 2007, at which time plaintiff reported feeling depressed.  (Tr. 269).  Plaintiff stated that the Effexor was no longer working.  (Id.).  Plaintiff reported that he was lonely because he did not have a girlfriend.  (Id.).  Plaintiff also indicated that he was having money problems and that he gotten into a heated verbal altercation with his father.  (Id.).  Plaintiff denied suicidal or homicidal thoughts.  (Id.).  Dr. Quadri found that plaintiff's insight and judgment were good.  (Id.).  Dr. Quadri noted that plaintiff was compliant with his medications.  (Id.).  Dr.

---

[15]Clonazepam is indicated for the treatment of panic disorder.  See PDR at 2895.

- 12 -

Quadri increased plaintiff's dosage of Lithium and added Wellbutrin.[16]  (Id.).

On March 28, 2007, plaintiff reported that he continued to feel depressed and that he was worse since his dosage of Effexor was lowered, despite the addition of Wellbutrin.  (Tr. 270). Plaintiff asked to see a therapist to help deal with stress.  (Id.).  Dr. Quadri stated that plaintiff's depression was currently mostly a product of loneliness and conflict with his father.  (Id.).  Dr. Quadri indicated that plaintiff has fleeting suicidal thoughts but denied intent or plan to act.  (Id.).  Plaintiff had a depressed affect but his insight and judgment were good.  (Id.).  Dr. Quadri noted that he might increase plaintiff's dosage of Wellbutrin at his next visit if he was still depressed.  (Id.).     On April 10, 2007, plaintiff reported that he continued to feel depressed and had no significant improvement in his mood.  (Tr. 271).  Plaintiff was compliant with his medications and reported a fine tremor from Lithium, which did not interfere with gross movements related to work like driving a forklift.  (Id.). Plaintiff's affect was depressed but he denied suicidal or homicidal thoughts.  (Id.).  Plaintiff's insight and judgment were good.  (Id.).  Dr. Quadri increased plaintiff's dosage of Wellbutrin.  (Id.).

Plaintiff saw Dr. Quadri on May 9, 2007, at which time he reported that he had been working long hours and that this had been good for his mood because he had no time to brood over negative thoughts.  (Tr. 272).  Plaintiff had a depressed affect but denied suicidal or homicidal thoughts.  (Id.). Plaintiff's insight and judgment were good.  (Id.).  Dr. Quadri continued plaintiff's medication regimen.  (Id.).

On June 5, 2007, plaintiff reported feeling depressed and lonely.  (Tr. 273).  Plaintiff indicated that he dreams about having a girlfriend and being intimate.  (Id.).  Plaintiff reported working long

_____

[16]Wellbutrin is an antidepressant indicated for the treatment of depression.  See PDR at 1656.

hours.  (Id.).  He denied any suicidal, violent, or aggressive thoughts or impulses.  (Id.).  Plaintiff's affect was depressed.  (Id.).  Plaintiff's insight and judgment were good.  (Id.).  Dr. Quadri continued plaintiff's medications.  (Id.).

On July 3, 2007, plaintiff reported that he had fallen asleep behind the wheel while driving to meet a woman he met online.  (Tr. 274).  Dr. Quadri reminded plaintiff not to take Clonazepam before driving.  (Id.).  Plaintiff reported that he was starting to "hear voices again" for the past week. (Id.).  Plaintiff stated that he heard his name being called while working and stopped the fork lift to listen.  (Id.).  Plaintiff indicated that he heard two voices talking the morning prior to his appointment. (Id.).  Plaintiff reported feeling somewhat paranoid and had been thinking that someone was "playing a joke or mind game" with him.  (Id.).  Plaintiff denied any suicidal or violent thoughts or impulses. (Id.).  Plaintiff's thought process was logical and sequential and his insight and judgment were good. (Id.).  Dr. Quadri added Abilify[17] for plaintiff's auditory hallucinations.  (Id.).

On July 31, 2007, plaintiff reported that he was being stalked by a very large woman who he met a week prior.  (Tr. 275).  Plaintiff reported feeling depressed and had fleeting suicidal thoughts about ten days prior, although he did not have a plan.  (Id.).  Plaintiff indicated that the voices and paranoia had diminished but not gone away with the Abilify.  (Id.).  Dr. Quadri noted that plaintiff had been hypervigilant.  (Id.).  Plaintiff was polite, calm, and cooperative with good eye contact. (Id.).  Plaintiff's affect was mildly dysphoric.  (Id.).  Dr. Quadri increased plaintiff's dosage of Abilify. (Id.).

On August 15, 2007, plaintiff reported an increase in tremors.  (Tr. 276).  Plaintiff's mood

---

[17]Abilify is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR at 1027.

remained "unhappy as always." (Id.). Plaintiff continued to have chronic suicidal thoughts but denied intent or plan to act. (Id.). Plaintiff reported occasionally hearing his name being called. (Id.). Plaintiff indicated that he did not want to wean off Straterra because it helped him to focus his thoughts. (Id.). Dr. Quadri decreased plaintiff's dosage of Lithium and discontinued Abilify. (Id.).

On August 29, 2007, plaintiff was anxious and worried about losing Medicaid. (Tr. 277). Plaintiff had been depressed and had fleeting suicidal thoughts with no plan to act. (Id.). Plaintiff had no manic or psychotic symptoms. (Id.). Dr. Quadri continued plaintiff's medications. (Id.).

On September 26, 2007, plaintiff reported feeling depressed because of loneliness and an inability to find a girlfriend. (Tr. 278). Plaintiff also indicated that he was depressed about not being offered a job at the Coca Cola company. (Id.). Plaintiff's suicidal thoughts had been in the background and plaintiff denied active planning or ideation. (Id.). Plaintiff's affect was depressed with no lability. (Id.). Plaintiff reported no auditory or visual hallucinations. (Id.). Dr. Quadri continued plaintiff's medications. (Id.).

On October 24, 2007, plaintiff reported feeling depressed because he had lost his job with Coca Cola. (Tr. 279). Plaintiff had been staying home watching television most of the time and was bored and lonely. (Id.). Plaintiff denied having any suicidal thoughts. (Id.). Plaintiff's affect was depressed with no lability. (Id.).

On November 21, 2007, plaintiff reported that he was "doing well considering everything that's going on." (Tr. 280). Plaintiff's eleven-year-old son who lives in Arizona had tried to commit suicide. (Id.). Plaintiff remained unemployed and had been hiding in the basement to "get away from the world." (Id.). Plaintiff was bored and lonely. (Id.). Plaintiff denied suicidal thoughts or hallucinations. (Id.). Plaintiff's affect was depressed with no lability. (Id.). Dr. Quadri continued

plaintiff's medications.  (Id.).

On December 5, 2007, plaintiff presented with a "so so" mood and euthymic affect.  (Tr. 281).  Plaintiff was dressed casually and his grooming was fair.  (Id.).  Plaintiff had a low energy level with no anhedonia.  (Id.).  Plaintiff reported feeling lonely.  (Id.).  Plaintiff's son who is in prison had been advising plaintiff to date his ex-girlfriend's mother.  (Id.).  Plaintiff had no mood swings and no recent suicidal thoughts.  (Id.).  Dr. Quadri continued plaintiff's medications.  (Id.).

On January 9, 2008, plaintiff reported that his family had noticed considerable tremor.  (Tr. 282).  Plaintiff's mood was "better" since he had started dating someone.  (Id.).  Plaintiff's affect was euthymic.  (Id.).  Plaintiff's energy level was improved and his daytime napping decreased since he started using a CPAP machine.  (Id.).  Plaintiff had no anhedonia, no mood swings, no recent suicidal thoughts, and no psychosis.  (Id.).  Dr. Quadri reduced plaintiff's dosages of Straterra and Lithium. (Id.).

On February 6, 2008, plaintiff reported that he was doing well and that his mood was improved.  (Tr. 283).  Plaintiff's tremor was reduced.  (Id.).  Plaintiff was "in love" with a woman and had been spending a lot of time on the phone with her.  (Id.).  Plaintiff had no mood swings and his energy level was good.  (Id.).  Dr. Quadri continued plaintiff's medications.  (Id.).

On March 5, 2008, plaintiff reported that he "nearly jumped off the Washington bridge last night." (Tr. 284).  Plaintiff had been rejected by his girlfriend that night and learned that his girlfriend was seeing another man.  (Id.).  Dr. Quadri strongly advised plaintiff to go to the hospital for his safety but he refused to go.  (Id.).  When Dr. Quadri told plaintiff he was calling an ambulance, plaintiff ran out of the office.  (Id.).

Plaintiff was admitted to St. Joseph Health Center because of suicidal ideations on March 5,

2008. (Tr. 236). Plaintiff was sent to the hospital by Dr. Quadri after he reported a plan to jump off a bridge. (Id.). Plaintiff felt very distressed after admission but denied suicidal ideations. (Id.). Plaintiff appeared to be quite labile and anxious and irritable. (Tr. 234). Plaintiff's concentration was poor, his memory was fair, his estimated IQ was in the normal range, and his insight and judgment were impaired. (Tr. 234). William Wang, M.D. diagnosed plaintiff with bipolar disorder and medical noncompliance, history of ADHD, history of marijuana abuse, and Cluster B traits. (Id.). Dr. Wang assessed a GAF[18] score of 35.[19] (Tr. 235). Plaintiff was treated with a regimen of Wellbutrin, Straterra, and Effexor, and attended daily treatment groups. (Tr. 236). Plaintiff's mood improved and plaintiff was discharged on March 9, 2008. (Id.). Plaintiff denied any suicidal or homicidal ideations and auditory or visual hallucinations at the time of discharge. (Id.). Plaintiff's discharge diagnoses were bipolar affective disorder, medical noncompliance; history of ADHD; and history of marijuana abuse. (Id.). Dr. Wang assessed a GAF score of 50.[20] (Id.).

On April 1, 2008, Dr. Quadri noted that plaintiff had been hospitalized for four days under

---

[18]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[19]A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

[20]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32. A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 32.

care of Dr. Wang on court order initiated by Dr. Quadri because of suicidal threats. (Tr. 285). Dr. Quadri indicated that plaintiff resisted arrest and was tasered by police. (Id.). Plaintiff's dosage of Lithium was increased in the hospital and plaintiff now denied having any suicidal or homicidal intent. (Id.). Plaintiff was now back with his girlfriend. (Id.). Plaintiff's thought process was logical and sequential, and he had no hallucinations or delusions. (Id.). Dr. Quadri reduced plaintiff's dosage of Effexor. (Id.).

On April 29, 2008, plaintiff reported that he was worried about his girlfriend writing to her boyfriend who was about to get out of jail. (Tr. 286). Plaintiff reported doing well and had no complaints. (Id.). Plaintiff denied feeling sad, depressed, or anxious. (Id.). Plaintiff's affect was euthymic with no lability. (Id.). Plaintiff's responses were logical and goal-directed. (Id.). Plaintiff denied suicidal thoughts and hallucinations. (Id.). Plaintiff's insight and judgment were good. (Id.). Plaintiff's medications were continued. (Id.).

On May 21, 2008, plaintiff reported doing well. (Tr. 287). Plaintiff's mood was good and his affect was euthymic. (Id.). Plaintiff reported that he was engaged to his girlfriend and planned to marry the following May. (Id.). Plaintiff appeared very happy. (Id.). Plaintiff denied suicidal intent or hallucinations. (Id.).

Dr. Quadri completed a medical source statement on June 11, 2008, in which he indicated that plaintiff's diagnoses were bipolar I disorder-depressed, ADHD, and borderline personality disorder. (Tr. 265). Dr. Quadri indicated that plaintiff had no restrictions in his daily activities. (Id.). Dr. Quadri found that plaintiff had difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace; and repeated episodes of deterioration in a work-like setting. (Id.). Dr. Quadri expressed the opinion that plaintiff had a poor ability to understand and remember

instructions in a work setting, sustain concentration and persistence in tasks in a work setting, and interact socially and adapt to his environment in a work setting.  (Id.).

On June 25, 2008, plaintiff reported that he was doing well.  (Tr. 292).  Plaintiff's mood was good and his affect was euthymic.  (Id.).  Plaintiff was dealing with financial stress from needing money for a trailer that he will rent with his girlfriend.  (Id.).  Plaintiff indicated that he felt better when he was not at home because his dad "constantly tried to aggravate [him]."  (Id.).  Plaintiff denied suicidal intent or hallucinations.  (Id.).

Robert Cottone, Ph.D. completed a Psychiatric Review Technique on July 23, 2008.  (Tr. 317-26).  Dr. Cottone diagnosed plaintiff with bipolar disorder and ADHD, which did not precisely satisfy diagnostic criteria; and personality disorder.  (Tr. 320, 322).  Dr. Cottone expressed the opinion that plaintiff had moderate limitations in his activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  (Tr. 325).  Dr. Cottone noted that plaintiff's condition was stable and "at a level that would allow for very simple work with limited interaction." (Tr. 327).

Dr. Cottone also completed a Mental Residual Functional Capacity Assessment.  (Tr. 329-331).  Dr. Cottone expressed the opinion that plaintiff was markedly limited in his ability to understand and remember detailed instructions; carry out detailed instructions; and interact appropriately with the general public.  (Id.).  Dr. Cottone found that plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others. (Id.). Dr. Cottone concluded that plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, and public contact. (Tr. 331). Dr. Cottone found that plaintiff was capable of remembering, carrying out and persisting at simple tasks; making simple work-related judgments; relating adequately to co-workers or supervisors; and adjusting adequately to ordinary changes in the work routine or setting. (Id.).

Plaintiff saw Dr. Quadri on September 3, 2008, at which time plaintiff appeared sleepy. (Tr. 334). Plaintiff reported that he slept twelve hours daily and had daytime somnolence. (Id.). Plaintiff was feeling depressed and wanted to curl up into a corner. (Id.). Plaintiff's relationship with his fiancé was strained because of distance. (Id.). Plaintiff also reported having an altercation with his father over the phone bill. (Id.). Dr. Quadri discontinued the Trazodone because plaintiff was sleeping too much. (Id.).

Plaintiff saw Dr. Quadri on October 15, 2008, at which time plaintiff reported feeling under stress due to problems with his fiance's daughter and the fact that his parents will not allow his fiancé to live in their basement with him. (Tr. 391). Plaintiff denied suicidal or homicidal thoughts. (Id.). Plaintiff reported no hallucinations or delusions. (Id.).

On November 12, 2008, plaintiff reported that everything was about the same. (Tr. 390). Plaintiff indicated that his son was returning home from prison the following month after being

incarcerated for three years. (Id.). Plaintiff described his mood as "stressed out and down." (Id.). Plaintiff denied having any suicidal or homicidal thoughts. (Id.). Plaintiff was sleeping more than usual and had "nothing else to do." (Id.). Plaintiff was unable to find a job and had severe financial stress. (Id.). Plaintiff had no mood swings or anhedonia. (Id.). Plaintiff's affect was euthymic. (Id.).

On January 7, 2009, plaintiff reported that he had been feeling "low and anxious" since his father was diagnosed with lung cancer. (Tr. 389). Plaintiff had increased hands tremor. (Id.). Plaintiff's sleep, appetite, and energy level was normal. (Id.). Plaintiff had no anhedonia or loss of interest. (Id.). Plaintiff had been sending out resumes online for a job and enjoyed playing video games. (Id.).

On February 22, 2009, plaintiff reported feeling emotionally numb after his father's diagnosis of terminal lung cancer. (Tr. 386). Plaintiff was unhappy and stressed but not depressed. (Id.). Plaintiff was keeping busy by chopping wood. (Id.). Plaintiff denied suicidal or homicidal thoughts. (Id.).

On March 11, 2009, plaintiff reported that his father died and that he was going downhill fast. (Tr. 385). Plaintiff indicated that he was trying to stay strong for his mother and sister. (Id.). Plaintiff stated that he felt guilty about not working to help out. (Id.). Plaintiff had thoughts about running away to escape the situation. (Id.). Plaintiff reported mood swings and stated that he felt like crying sometimes. (Id.). Plaintiff's mind was racing and his concentration was poorer. (Id.). Plaintiff reported spacing out and not hearing people talk to him. (Id.).

Plaintiff saw David A. Lipsitz, Ph.D. for a Psychological Consultation upon referral by his attorney on April 20, 2009. (Tr. 398-402). Plaintiff's affect was bright and his general appearance

was good as was his attitude. (Tr. 398). Dr. Lipsitz stated that good rapport was established between plaintiff and the examiner and testing conditions were excellent. (Id.). Plaintiff's chief complaint was a loss of concentration. (Id.). Plaintiff reported that he starts to get something and turns around and forgets what he wanted to get. (Id.). Plaintiff stated that this has cost him several jobs. (Id.). Plaintiff reported that he shakes a lot and becomes very anxious and nervous. (Id.). Plaintiff complained of severe mood swings. (Tr. 399). Plaintiff reported manic episodes where his mind races and he has trouble sleeping, and he spends money unnecessarily. (Id.). Plaintiff indicated that he has been diagnosed with ADHD. (Id.). Plaintiff reported hearing voices talking to him, which tell him to do different things and question what he is doing. (Id.). Plaintiff also reported experiencing some visual hallucinations. (Id.). Plaintiff stated that he feels like people are following him around and are out to get him. (Id.). Plaintiff reported that he gets depressed and has some suicidal thoughts but no plans or intent. (Id.). Plaintiff also complained of recurrent anxiety attacks. (Id.). Plaintiff reported that he liked to target shoot with his pellet gun and that he spent most of the time just sitting home watching television, shooting his guns or chasing squirrels or racoons. (Tr. 400). Dr. Lipsitz administered the Wechsler Adult Intelligence Scale-III, which revealed a Verbal IQ of 86, Performance IQ of 84, and Full Scale IQ of 84, placing plaintiff within the "low average" range of intellectual functioning. (Id.). Dr. Lipsitz found that plaintiff was in no acute distress; and was oriented to time, place, and person. (Tr. 401). Dr. Lipsitz noted that there was evidence of possible psychotic process with both auditory and visual hallucinations and paranoid ideations, but no full-blown delusional thought processes. (Id.). Plaintiff's affect was bright but his mood was depressed. (Tr. 402). Dr. Lipsitz found no evidence of any current suicidal ideations or impulses and no plans or intent to harm himself. (Id.). Dr. Lipsitz noted that plaintiff's thought processes were

primarily preoccupied with his physical and mental problems and his inability to hold down a job and function within society. (Id.). Dr. Lipsitz diagnosed plaintiff with bipolar disorder, ADHD, and rule out schizophrenia, paranoid type.[21] (Id.). Dr. Lipsitz assessed a GAF score of 47. (Id.). Dr. Lipsitz stated that plaintiff was in need of ongoing psychiatric treatment combining medication with individual psychotherapy. (Id.).

In a Case Analysis dated July 28, 2009, Richard Kaspar, Ph.D. indicated that he had reviewed the evidence in the file and affirmed the mental residual functional capacity assessment dated July 23, 2008. (Tr. 341).

In a Case Analysis dated August 7, 2009, Harold Keairness, M.D. stated that there was medical evidence that plaintiff has obstructive sleep apnea and obesity but no medical or claimant evidence of functionally limiting symptoms from those conditions. (Tr. 342).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since October 14, 2007, the alleged onset date (20 CFR 404.1520(b), 404.1571, *et seq.*, 416.920(b) and 416.971, *et seq.*).

3. The claimant has the following "severe" impairments: obstructive sleep apnea, obesity, depression, attention deficit hyperactivity disorder, and borderline personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets

---

[21]Paranoid schizophrenia is a type of psychosis characterized predominantly by delusions of persecution and megalomania. Stedman's at 1729.

or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift up to 50 pounds, frequently lift 25 pounds, stand six hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. He cannot perform work that requires he climb ropes, ladders, or scaffolds, and he must avoid concentrated exposure to pulmonary irritants, industrial hazards, and unprotected heights. The claimant is limited to unskilled work that requires no more than occasional contact with the general public or with other coworkers.

6.     The claimant is capable of performing his past relevant work. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from October 14, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-18).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on May 13, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on May 13, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 18).

### Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a

reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step

two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel,

152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals

a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in discrediting the opinion of plaintiff's treating psychiatrist, Dr. Quadri.  Plaintiff further argues that the mental residual functional capacity determined by the ALJ is not supported by substantial evidence.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)).  Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).  Such opinions, however, do "not automatically control, since the record must be evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'"  Id.

(quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Dr. Quadri completed a medical source statement on June 11, 2008, in which he indicated that plaintiff's diagnoses were bipolar I disorder-depressed, ADHD, and borderline personality disorder. (Tr. 265). Dr. Quadri indicated that plaintiff had no restrictions in his daily activities. (Id.). Dr. Quadri found that plaintiff had difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace; and repeated episodes of deterioration in a work-like setting. (Id.). When asked to express an opinion regarding plaintiff's maximum remaining ability despite any observed functional limitations to perform work-related functions in an ordinary work setting, Dr. Quadri found that plaintiff's ability to understand and remember instructions, sustain concentration and persistence in tasks, and interact socially and adapt to his environment were "poor." (Id.).

The ALJ summarized Dr. Quadri's opinion. (Tr. 15-16). The ALJ stated that Dr. Quadri diagnosed plaintiff with bipolar disorder, ADHD, and "a borderline IQ." (Tr. 16). The ALJ concluded that "[t]he overall treatment records by Dr. Quadri do not support that the claimant has significant limitations in the areas noted by Dr. Quadri in his June 11, 2008 medical source statement." (Id.).

The ALJ then discussed Dr. Quadri's findings separately. (Id.). With regard to Dr. Quadri's opinion that plaintiff had limitations in his concentration, persistence, and pace, the ALJ pointed out that Dr. Quadri found on multiple occasions that plaintiff's thought processes were logical and sequential, and that plaintiff's insight and judgment were good. (Tr. 16). The ALJ stated that, although plaintiff reported poor concentration on March 11, 2009, this is only an allegation by plaintiff and the records do not indicate that this impairment persisted over a long period of time. (Tr. 16, 385). With regard to plaintiff's social functioning, the ALJ stated that Dr. Quadri's records do not consistently support that plaintiff has significant limitations in this area. (Tr. 16). The ALJ stated that the medical record reveals that plaintiff has had some success and lack of success with the opposite gender, yet the records do not indicate that plaintiff has continued social functioning impairments as a direct result of a mental impairment or impairments. (Id.). The ALJ noted that when plaintiff is seeing someone of the opposite gender, his mood improves, and when he is not seeing someone it degenerates. (Id.). The ALJ reiterated that "[t]his condition is not the result of a medically determinable impairment." (Id.).

The undersigned finds that the ALJ erred in discrediting Dr. Quadri's opinion. Dr. Quadri had been plaintiff's treating psychiatrist since January 2005. Plaintiff saw Dr. Quadri regularly,

approximately monthly, from January 2005 through the date of his medical source statement. Dr. Quadri, a psychiatrist, is a specialist in the area upon which he rendered his opinion. As such, Dr. Quadri's opinion should be given controlling weight as long as it is well-supported.

The ALJ stated that Dr. Quadri diagnosed plaintiff with "borderline IQ." (Tr. 16). This statement is incorrect. Dr. Quadri never diagnosed plaintiff with borderline intellectual functioning. Rather, Dr. Quadri indicated in his medical source statement that plaintiff had a diagnosis of "Borderline P. D.," or borderline personality disorder. This is consistent with Dr. Quadri's records, which indicate that he has consistently diagnosed plaintiff with borderline personality disorder since 2005, and that he has never diagnosed plaintiff with "borderline IQ." The ALJ was obviously aware of this diagnosis, as he found that plaintiff's borderline personality disorder was a severe impairment. (Tr. 10).

The ALJ's factual error appeared to affect his analysis of Dr. Quadri's opinion. The ALJ pointed out that, although Dr. Quadri found that plaintiff "had limitations to his IQ that were 'borderline,'" Dr. Lipsitiz found that plaintiff had an IQ in the "low average" range. (Tr. 16-17). As such, the ALJ appeared to discredit Dr. Quadri's opinion, at least in part, based upon this factual error.

Further, in discussing Dr. Quadri's finding that plaintiff had limitations to his social functioning, the ALJ noted that plaintiff has had some success and lack of success with the opposite gender. (Tr. 16). The ALJ further stated that, when plaintiff is consistently seeing someone of the opposite gender, his mood improves, and when he is not seeing someone, it degenerates. (Id.). The ALJ concluded that "[t]his condition is not the result of a medically determinable impairment." (Id.).

Borderline personality disorder is defined as:

- 31 -

An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, *unstable interpersonal relationships*, inappropriate or uncontrolled affect, especially anger, identity disturbances, *rapid shifts of mood*, suicidal acts, self-mutilations, *job and marital instability*, chronic feelings of emptiness or boredom, and *intolerance of being alone.*[22] (emphasis supplied)

The defining characteristics of borderline personality disorder include unstable interpersonal relationships, mood disturbances, and an intolerance of being alone. The ALJ's summary of plaintiff's medical history in which he indicates that plaintiff has been involved in many relationships and that his mood worsens when he is not involved in a relationship describes characteristics typical of an individual diagnosed with borderline personality disorder. Dr. Quadri has consistently diagnosed plaintiff with borderline personality disorder and at times even indicated it was plaintiff's primary diagnosis. As such, the ALJ's finding that plaintiff's condition is "not the result of a medically determinable impairment" lacks support.

Dr. Quadri's opinion was based on a longitudinal perspective of plaintiff and is supported by his extensive treatment notes. With regard to plaintiff's concentration, persistence, and pace, the ALJ points out that Dr. Quadri found on multiple occasions that plaintiff's thought processes were logical and sequential and that plaintiff had good insight and judgment. (Tr. 16). While this is true, Dr. Quadri consistently diagnosed plaintiff with ADHD, which would affect his concentration, persistence, and pace. Dr. Quadri also noted on multiple occasions that plaintiff was depressed, experienced suicidal thoughts, and experienced auditory hallucinations. (Tr. 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 284). These symptoms would reasonably be expected to interfere with plaintiff's concentration, persistence, and pace. With regard to plaintiff's social functioning, Dr. Quadri documented plaintiff's many romantic relationships, which caused plaintiff to experience

---

[22]<u>Stedman's</u> at 568.

significant psychiatric symptoms. Dr. Quadri's treatment notes also reveal that plaintiff often complained about difficulties he had in the relationship with his father. Thus, Dr. Quadri's findings that plaintiff had significant limitations in concentration, persistence, or pace; and in maintaining social functioning are supported by his own treatment notes.

Dr. Quadri's opinion is also supported by the remainder of the medical evidence. The record reveals that plaintiff was involuntarily hospitalized from March 5, 2008 through March 9, 2008, for suicidal ideations after he reported to Dr. Quadri a plan to jump off a bridge. (Tr. 236). Plaintiff was treated by Dr. Wang during his hospitalization, who found that plaintiff's concentration was poor, his memory was fair, and his insight and judgment were impaired. (Tr. 234). Upon discharge, Dr. Wang diagnosed plaintiff with bipolar affective disorder, medical noncompliance; history of ADHD; and history of marijuana abuse. (Tr. 235). Dr. Wang assessed a GAF score of 35 initially and 50 at discharge. (Id.). Plaintiff had also been hospitalized for psychiatric complaints, including suicidal ideations, in 2005 and in 2006, prior to his alleged onset date. (Tr. 307-308, 294). Plaintiff saw Dr. Lipsitz for a consultative examination on April 20, 2009, at which time plaintiff's chief complaint was a loss of concentration. (Tr. 398). Dr. Lipsitz found that plaintiff's mood was depressed, and his thought processes were primarily preoccupied with his physical and mental problems. (Tr. 401). Dr. Lipsitz noted evidence of possible psychotic process with both auditory and visual hallucinations and paranoid ideations but no full-blown delusional thought processes. (Tr. 401-02). Dr. Lipsitz diagnosed plaintiff with bipolar disorder, ADHD, and rule out schizophrenia, paranoid type. (Tr. 402). He assessed a GAF score of 47. (Id.). Dr. Lipsitz's findings are consistent with the presence of limitations in concentration, persistence, and pace; and social functioning.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift up to 50 pounds, frequently lift 25 pounds, stand six hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. He cannot perform work that requires he climb ropes, ladders, or scaffolds, and he must avoid concentrated exposure to pulmonary irritants, industrial hazards, and unprotected heights. The claimant is limited to unskilled work that requires no more than occasional contact with the general public or with other coworkers.

(Tr. 12).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The undersigned finds that the ALJ's mental residual functional capacity determination is not supported by substantial evidence.[23] As previously discussed, the ALJ improperly assigned little weight to the opinion of plaintiff's treating psychiatrist, Dr. Quadri. The ALJ also discredited the opinion of Dr. Lipsitz, a consulting psychologist, who found that plaintiff had serious symptoms.

---

[23]Plaintiff does not challenge the ALJ's determination regarding plaintiff's physical limitations.

- 34 -

The ALJ appeared to rely instead on the opinion of a non-examining state agency psychologist, Dr. Cottone, who found that plaintiff should avoid work involving extensive interpersonal interaction or close proximity to co-workers or the public, but was capable of remembering, carrying out and persisting at simple tasks; making simple work-related judgments; relating adequately to co-workers or supervisors; and adjusting adequately to ordinary changes in the work routine or setting. (Tr. 331). The ALJ did not indicate the weight he was assigning to Dr. Cottone's opinion. To the extent the ALJ relied on Dr. Cottone's opinion, the ALJ's decision is not supported by substantial evidence. See Shontos v. Barnhart, 328 F.3d 418, 425-26 (8th Cir. 2003) ("[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole.").

The medical record reveals that plaintiff suffers from significant work-related limitations as a result of his mental impairments. The ALJ improperly discredited the opinion of plaintiff's treating psychiatrist and relied on the opinion of a non-examining state agency psychologist. The mental RFC formulated by the ALJ does not include the significant limitations found by plaintiff's treating psychiatrist. As such, substantial evidence does not support the ALJ's mental RFC determination.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to assign the proper weight to the opinion of plaintiff's treating psychiatrist Dr. Quadri, and formulate a new mental residual functional capacity for plaintiff based on the medical evidence in the record.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C.

§ 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections

to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right

to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __18th__ day of January, 2012.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE